OK, the next case is number 07-5174, American Airlines against the United States. Mr. Chaplin. May it please the court, good morning. I'd like to emphasize to the court today that this is an illegal exaction case that has significance beyond the specific user fees that are at issue here. We've emphasized, and I'm prepared to address today, but we've addressed in our briefs at some length why we say that the trial court erred, and in effect, what we would say, reading loopholes into these statutes and regulations to say that the airline is not responsible to remit fees that it does not collect and fails to collect. But beyond that, I want to emphasize that on this record, it's not possible to know whether at the bottom line illegal exactions occur. You're getting your damages issue down, Mr. Chaplin. Right. I was hoping to spend a fair amount of time on that, because in our view, the trial court, in essence, never recited or paraphrased and addressed our position with respect to that. I wanted to try to make sure it's clear. I can address the statutory and regulatory issues as well. But the point we want to leave the court with, with respect to what I'll call damages, is that it's even really broader than that. But I hope you're not going to skip over liability, because that's what troubles me. OK. If I just finish my thought, Your Honor, I'll speak to liability. But the issue here that we want to emphasize with respect to the damages is that we don't know, in any total respect, and we weren't given any visibility to government in discovering into this, how much American owed over these periods in these user fees and how much in total it paid. Obviously, we have a sense of how much in total it paid, because we received it. But the extent to which how much American owed under any interpretation of these user fees, statutes, and regulations. You were willing to impose your sampling method on them. Why isn't that a valid measure against you? Well, because a couple of reasons. Bottom line, really, is the same reason it's not in a tax case. The agencies did perform these audits. And they were not performed under protest. But yes, it was the agencies developed methodologies. They attempted to develop these error rates. And they, at the end of these audits, said, here's the amount that we extrapolate that you failed to collect, and therefore failed to remit, that you should not pay us. That is in the same posture, should be, because a tax case is also an illegal exaction variety of claim, as an IRS audit. If the IRS were to come and perform a calculation and say, you underpaid by this amount, the taxpayer can pay that amount in, can challenge the IRS's legal theory. But if the IRS persuades a court that the, I'm sorry, if the taxpayer persuades the court that the IRS's legal theory was wrong, the taxpayer just doesn't automatically get back the amount that the IRS asked for in the audit. Taxpayer has to prove de novo at trial how much it owed in that tax, and how much it paid. And it's, what we're saying is it's the same burden here. So, I mean, there are questions to be raised, perhaps, about the audits. But the fact is that in litigation, in any litigation, a pre-litigation agency audit is, in effect, irrelevant with respect to its findings. It simply served as the basis for what American paid, pursuant to the audits. But it's not, certainly, binding upon the government, certainly not in the tax arena, and there's no reason why it should be in the legal execution arena. Our, with respect to what we call liability, although, again, I would emphasize it is really the interpretation of the statutes and regulations that's at issue. Liability, bottom line, would have to be proven. The extent to which American paid more than it owed, we're not allowed to develop evidence on that. But with respect to the interpretation issues, our basic points here, with respect to both sets of statutes when we take regulations, which are not identical, of course, but quite similar, is that they say, they state that the carrier shall collect and shall remit. And they each say that the carrier is responsible for collecting. And that, when you step back and view these as user fees, the purpose of which is to obtain the price, the cost, if you will, of these inspections for each individual to cover the agency's cost of performing these inspections. The bottom line is that the way these agencies read these statutes and regulations for years appears to be consistent with what it says on its face. There are no exceptions. There are no exceptions set forth, one minor one, to the duty to collect or to the duty to remit. And that, in a nutshell, is how these have been, excuse me, interpreted by the agencies, excuse me, for many, many years. What does happen, in your view, Mr. Chavik, in the situation where, it's discussed in the briefs, where an individual refuses to pay the fee? Now, American Airlines posits that it can't stop that person from getting on the plane, and I take it the government doesn't dispute that. But what should happen, do you think, in that situation? Well, what should happen administratively is certainly with respect to the customs and border protection regulations, they explicitly state that the airline should take down individuals' detailed information and contact information. But you agree they can't keep them off the plane? Yes, but I'd also like to emphasize that that is something perhaps that we could go back and forth about in discovery, if we ever got into any discovery, of the actual collection processes. All that happened here in the trial court was the trial court looked only at the audits and only at the tickets that were examined in the audits. Do you say if you're, and I guess you're veering a little bit into damages, so I'll just ask you one question on that and then proceed where you want. Are you saying that in the damages issue here, that the audits have no relevance or that they're just part of the full picture? I mean, would you sort of totally throw out the audits? Because I think it is correct that the trial judge used the audits as the starting point and that was the focus. But what is your view as to what role, if any, the audits should play? Well, let me say this. They're not inadmissible. We're not taking the position that they'd be inadmissible in litigation. But they are certainly of minimal relevance and they are arguably of next to no relevance because the question that was addressed in the audits to develop an error rate, a collection error rate, and extract like that, is not really the question that needs to be answered here when we get to quantum. What kind of discovery, precisely, would you want on a damages, on a remand for damages? Well, what we were asking, at the point at which the Americans saw a protective order form, was to look into, for example, there are accounts which have been known as the XT and ZZ accounts. It's my understanding that airlines have fairly standard accounts for this. But where miscellaneous taxes and fees are deposited based on a ticket, collection through a ticket, and then are, in effect, distributed back out to the accounts in which they appear to belong. So there's a process through which some of these user fees, certainly some user fees are collected by American, put into the miscellaneous account and then allocated to the account for remittance for the government. That was, the point at which we were stopped is the point at which we wanted to ask, we'd like to know more about that. We'd like to know how the allocation is done so that we can see, get some confidence that the government received the proper amounts that the American was collecting. Mr. Chadwick, you're saying that the court should reject that 99% of the passengers paid the fees and that the fees were properly remitted? You want to start from scratch and what? I'm not sure I understand. I had assumed that the only question was whether the 1% estimate based on the sampling should be sustained and what kind of proof or evidence or discovery into that 1% you didn't receive that would have been appropriate. Is that incorrect? Yes, in fact, that is incorrect, Your Honor. What we were seeking and sought from the beginning was exactly as we would in the tax matter. De novo proof, de novo some discovery. You reject the 99% that was paid? I'm not sure I understand what kind of project you were proposing to add to this structure which has been in existence for quite a while. Well, in litigation, this is obviously not, this is not imposed at the administrative level, just as in tax litigation. In litigation, when the claim is that the government has exacted more than the payer owed, what needs to be proven up is how much did the payer owe and how much did the payer pay? And what we need is trial, admissible trial evidence and not simply to rely on the agency audits, the pre-litigation audits performed by the agency. So that for all of the years that are at stake, you what, wish substantiation for every single $7 that was collected and paid over? Well, we never got to that point. At a trial of the matter, if we were allowed any visibility and we're not limited to strictly looking at the tickets, 48 error tickets that were found in the audits over the years, if we're not limited to that, a trial might involve estimates and extrapolations and testimony by accounting experts and the like, but we never got close to that point. What we were, we were stopped at the doorstep. So you're rejecting, just to make sure we understand, because the trial judge, I didn't get the impression that there was something inappropriate in terms of where, after the limited discovery was completed, of what else should have been made available or what it is that you believe, you believe the burden was on American Airlines to substantiate the 99% for which they did pay the tax? Well, we don't know it's 99% because when we got to trial, the burden was not on us. I thought that it was agreed that there was a 1% non-payment rate. No, it was never agreed. The audit results are what they are, but once we got to litigation, we began saying, the crux of any illegal execution claim, an American's claim here, is that American has paid more in these user fees than it owed for the periods in question. And we said, okay, let's have a little discovery. Let's look into it. We think we know how much you paid because we received it. Let's look into how much you owe. Let's see, just let's have some visibility to your collection processes and assure that we understand how you do that. We would never allow that visibility. I'm sorry, did you? The, are you saying you wanna sort of get an understanding of the process that's used or kind of a audit? Well, I was- Because an audit can be very exhaustive. Are you just, are you saying, Mr. Chad, the government wants to be satisfied that there's a proper process in place, or do you wanna determine that and then go from there and conduct a sort of a review of the whole thing? I'd say that it's more than the process, Your Honor. We wanna get at the quantum here. We want to be able to, as a defendant, to look into, okay, the claim is, American, you paid more than you owe. We believe it's not. You don't simply look at the audits and say, what did the agencies ask you to pay as I'm collecting? Well, no, I understand, but I mean, how much do you wanna conduct as your own independent audit? Because it is a sizable claim. I guess the amount is about 2.7 million, something like that. But, I mean, I guess what I'm trying to get at is, does the government wanna sort of go back and recreate what happened with respect to all of these tickets? To an extent, Your Honor, I really don't wanna duck the question, but I wanna emphasize that it goes directly to our discovery issue. We're being asked, what is it that you want to see inside the black box? And we're saying, well, first, we'd like to look in, see what it is. There may be nothing for us to- That'd be very helpful to us to figure out if we will have to decide this case, what it is that you're looking for. Well, we- And it also strikes me that in your argument this morning in response to the question, you're not really arguing with the district court anymore about whether American has to pay over what they didn't collect. Well, this- That's not, you conceded that the government is, the court is right on that. We haven't conceded that at all, but you- Well, it sure sounds like it. I've used, you conceded, Your Honor, I was trying to use my time to emphasize what we thought was a broader issue. Well, I heard that over and over and over again, but you've totally avoided that issue, and I take it as a concession. Well, we don't mean it that way, Your Honor, but I stick with, I think what I was saying is that the key point that is for any trial court, it's not simply a matter of rejecting. The trial court thought that it could simply conclude that the theory upon which the agencies collected this money from American was incorrect. And at that point, that meant that whatever was collected was illegally exacted. That is not how an illegal exaction is established. Illegal exaction is, I paid in more than I owed, and there has to be- Is your position, Mr. Chavity, you want to get some better understanding of the process than you say you now have, and then make a good faith determination as to what, if anything, more has to be done in terms of examining particular transactions? You're saying you might, at the end of the day, say, okay, we can live with the audit, or no, we've got to look at some more figures. Is that kind of where we are? Yes, that's very much. What we had said to the trial court was that we believed we were in ordinary civil discovery, and we had given out sort of a preliminary set of document requests and discovery requests, and we had focused on these two accounts that we wanted to see more about. And we thought that would lead us to decide whether there was any further to go down the road. But the important thing to be to focus on what American collected and what it paid, and not to be focusing back on the pre-litigation audits. Oh, I understand. Is it possible, though, and theoretically, I'm not holding this, I'm just trying to understand the problem, is that at the end of the day, the government could get in and look at everything and say, well, in order to resolve this as a litigation matter, we'll accept the audit, or the government might say, no, we need more. Is that the correct understanding? It's absolutely possible. We simply wanted the visibility that the defendant should have into what we believe is the actual crux of the claim,  Thank you. Thank you. We'll save you some time for rebuttal. Thank you. We have one over here from the other side. Mr. Feinberg. Good morning, Your Honors. May it please the Court. Let me start with the issue of liability. For American, the issue is simple and straightforward, and involves a simple matter of statutory construction. The question is, do the agencies have the authority to hold airlines liable when they should have, but did not collect a particular user fee? The two statutes in question answer that issue dispositively in American's favor. If you look, for example, at the immigration statute, it says, the person who collects fees under paragraphs one or two shall remit those fees to the Attorney General at the time before the date that is 31 days after the close of the calendar quarter in which the fees are collected. Under the statute, if there was no collection, there's no obligation to remit the fees. The statute in the case of the AQI user fee is similar. It says, fees collected under this subsection by any person on behalf of the Secretary are held in trust with the United States and shall be remitted. Again, it's the fees that are collected that shall be remitted. The government points out in its briefs that the AQI statute isn't as thorough as the immigration statute, and there's much more in the regulations, and that is, of course, true. But on the central point, that point being when somebody acts as a collector, which fees do they need to collect? That central point is answered dispositively by the statute, as I just read. It's the fees collected that shall be remitted to the Secretary, as stated in Title 21, Section 136A.A.3. There's no need to look beyond that to the regulations, but if you do, you only get a fuller picture of how there cannot be liability on airlines for uncollected user fees. The regulations state that it's the carrier whose tickets or documents are marked to reflect collection that must remit the fee. Again, if the documents aren't marked to show that you as the airline collected the fee, you don't owe it. And the regulations, in each case, recite the requirement that the fees be submitted within 30 days of the close of the calendar quarter. Again, I'm sorry, the calendar quarter that they were collected. Again, it's clear in the regulations that if they weren't collected, there's no liability on the airline to pay. There are a variety of other indications in the regulations that we discussed in the briefs, and I'm not gonna go into all of them. But I do think it's interesting to note that in the government's reply, the only one of these textual arguments that the government addresses is perhaps the least important of them all, and that is the little snippet that requires that a statement be submitted that sets forth the amount, in singular, of collected and remitted fees. And granted, we think that that's in our favor, but the other provisions are much more clear that airlines must remit only the user fees that they actually collect. All of the other indications in this case point in the same direction. Again, we see no need to move beyond the text of the statute and certainly no need to move beyond the text of the statute and the regulations, but all the case law and a near century of Congress's use of user fees and taxes that are either collected, so-called collected taxes, where the collector of the tax is not liable if they fail to collect. Robert, let me ask you, an oral argument, Mr. Chadwick said he is not conceding the liability point, but he devoted his main focus, as you've heard, to what we'll call by way of shorthand the damages issue. And he, as I understand it, he is saying that basically what you have to do here to determine the correct amount of the government's damages if one determines there's liability is to subtract from what American paid, what it owed. And he says, well, at the end of the day, and again, I can't speak for him, but I hope I'm accurately describing what he said. He said, look, at the end of the day, we may well accept the audits as determined, or to be candid, we may, or to be honest, he would say, we may need to, we may get in there and say, no, we need to look a little more, your honor. So he's saying we may need to look more, but we may accept the audits. He just says, we need to know something about the process. What is wrong with that? Well, I guess, let me divide that question. If I'm accurately described what he said. And let me divide it into two different pieces, because I do think there are two separate questions. First of all, the question of what the process was and how these user fees are collected and things like that, those American degrees are plain irrelevant. No, I think he's talking about the process of internal flow of funds at American. And then he would like to look at that and say, well, okay, I'm satisfied the audit does it, we'll pay. Or he would say, no, we've got to look at a little more. I'm talking about that. My point is that contrary to Mr. Chadwick's claim, the government took a great deal of discovery on those questions. If you look, for example, at our expert report, which begins in the appendix at page A393, our expert, Mr. Williams from Deloitte, spend a huge amount of time at American studying the process that is used to collect these user fees, what accounts they go into, the flow of the money, how they're accounted for, things like that. The government took documentary discovery. For example, they asked for all the documents regarding the procedures and we produced the procedure that is used to collect these user fees. In fact, we produced, I think, three or four copies with different dates throughout the relevant time period. Another example appears at page A189 of the appendix. It was one of the interrogatories the government asked. It says, for the entire time period during which American issued or honored any passenger tickets for which it seeks to recover uncollected user fees in this matter, please describe in detail all policies, systems, and procedures used by American or any party acting on its behalf to attempt to assure that the user fees were collected. It goes on and gives a lot more detail than that. But my point is that there was a substantial amount of discovery into the process itself. And I think the court need look no further than the fact that the government at no point filed a motion to compel or otherwise complained about the scope of discovery other than this one very narrow issue about the XT and the, sorry, the ZZ and the XT allocations. Yes, it seems to have been an amicable proceeding between the parties. I'm sorry?  between the parties, albeit within the context of litigation. I believe that's absolutely correct, Your Honor. And that's part one. So in a very general sense, there was full discovery into the processes that were used. There's a different issue going on, and I think that the government has confused several legal issues. Let me step back a little bit and explain where this concept derives from. The government in its briefing and during oral argument cited this notion of an overpayment of taxes or user fees. In other words, in order to succeed, a taxpayer must show that it made an overpayment in total. You can't just say, oh, well, you know, this government, you overcharged us over here, and therefore we're entitled to a refund. You must look at the entire tax for the entire year for that taxpayer and make sure that there was indeed an overpayment. That doctrine comes from the Supreme Court's 1932 decision in Lewis v. Reynolds, which was a very simple decision. And the taxpayer there had to do with an estate tax. The taxpayer took two deductions, and the government said during the administrative proceedings that one you can't have, and so you owe some tax. And the taxpayer filed for a refund. And then during the refund proceedings, the government said, oh, well, even if you do get that deduction that we say you don't get, you don't get this other one that we didn't mention. And even though the statute of limitations has run against us, the government, and we can't claim that back, you cannot get a refund because a refund requires that there be an overpayment of all your taxes for the year. And the Supreme Court agreed with that position and said, even though the statute has run and the government couldn't affirmatively seek money from the taxpayer, because there hasn't been an overpayment of that tax for the entire year, the taxpayer failed. That doctrine, however, has a number of limitations that the government simply wants to ignore. The most important, well, there are two most important ones, I guess. The first is that that doctrine applies solely in the context of federal tax. That notion was made crystal clear by this court in its decision a few years ago in the Pacific Gas and Electric case. In that case, the taxpayer received a refund, and the government, in connection with the refund, made an overpayment of interest. It just computed the interest incorrectly. Statutory interest goes along with any refund payment. And the taxpayer, years later, filed for a separate refund involving the same tax year. And the government said, uh-uh, under Lewis v. Reynolds, we're going to offset the amount that we confess we owe you in this refund suit, but we're gonna offset that against amounts you owe us for the same tax year, and specifically, the overpayment of interest that the IRS had made in the previous year. And this court said no. And the reason it said no was because the doctrine in Lewis v. Reynolds applies specifically because of language in the tax law that requires that there be an, quote, overpayment of the tax. And it said that the interest that the taxpayer received, this isn't deficiency interest, this was interest that the taxpayer received in connection with a refund, that that was not a tax. And therefore, it couldn't be the subject of an offset. In our case, we have no taxes whatsoever. We're several steps removed from interest on a refund for a federal tax that was at issue in Pacific Gas and Electric. And here, we have, it's not a federal tax, and so this entire doctrine doesn't apply. The simple question should be how much was owed and how much did we pay? The second big problem that the government is ignoring is the mechanics that go along with this doctrine in Lewis v. Reynolds. And the courts, almost every court to look at this issue describes this as an offset. The government is seeking to offset the refund with some other liability in the same tax year that the taxpayer has. Indeed, if you look in this court's Pacific Gas and Electric case, it describes the notion, it describes in detail the Lewis v. Reynolds case and says, basically, that case says the government can offset a refund amount with any other amount that the taxpayers do. And that notion appears in many, many cases. We cited a bunch of them, the Booter case from the Eighth Circuit, the Mahoney case, the St. Louis Railroad case, both of those latter two from this court's predecessor, and a number of others that say, if you're doing that as the government, if you wanna come in and say, we wanna offset what we owe you because of your specific refund argument with some other amount that you may have owed us for the same tax year, the government must plead that. They must come forward and say, this is what we think you owe. And they are not allowed to take discovery on that issue until they do plead it and have some concrete basis for doing so. Almost every case that we cite in this section and that the government cites, for that matter, like the Dicer case, for example, says exactly that. And so what the government tries to do is say, oh, no, no, well, it's not an offset. Well, they might wanna say it's not an offset, but that's exactly what it is. They try to define it as, well, it doesn't have to do with the same section. Well, that has nothing to do with it. If you look at all of the cases, like Mahoney or Booter, any of the others, nothing turns on whether or not it's from the same section of the code. The Internal Revenue Code has hundreds, if not thousands of sections. The statutes that we're dealing with have only one, so everything's under the same section. But the point is, the audits themselves have to be relevant. That is the amount of the assessment that the government made for uncollected user fees. We didn't come up with that number. That is the number that we paid over. It's not, it's relevant, but not dispositive. We do agree with the government that the audit, in and of itself, cannot provide the answer, which is exactly why we hired a damages expert who spent quite a lot of time and money examining how much of the assessment for uncollected user fees actually represented uncollected user fees, and we proved that the audit was essentially right. It was off a little bit. Some of the audit assessments really were collected fees as opposed to uncollected fees. So it's not dispositive, but it has to be relevant, because that's the amount the government said to us, you must pay, you must pay this amount. And in our view, that's the ceiling. And that's, not only is it the ceiling, but it's the only relevant world we ought to look at. To the government, they want to open up the entire universe and say, we don't want to look at just the money we made you pay because of the audit assessments. We want to look at the $559 million made up of approximately seven and three dollar user fees, which obviously is hundreds of millions of individual user fees. And we want you, American Airlines, to have the burden of proving the correctness of every single one of those, and not only that, but we want to take discovery on all that so we can try to find some deficiencies. That is simply not what the cases say, unless the government has pled an offset, which they have not. And in addition to that, common sense tells you that if that's how a tax refund litigation worked, every tax refund litigation would be hopelessly bogged down as a taxpayer who had some specific refund request had to prove every dollar of income in their tax return. Fortunately, that's not what the cases say. Anything else that you feel you must tell us at the moment? We have a little more time, if you'd like. I don't believe so, Your Honor. Thank you. Okay, thank you, Mr. Feinberg. Thank you, Your Honor, for your time. We are not confused about the nature of the legal execution. American, it's come before the trial court claiming that it paid more than it owed for these periods. Did American pay more than it owed? We don't know. All we know is that American, in what was just characterized as discovery by the United States, clearly it's not, American invested in an accounting expert to go back and check the agency's audits to see that what the agency's called non-collection was in fact non-collection for 48 tickets. That is not discovery into whether American paid more. Mr. Chan, let me, on this damages issue, assume that I was the trial judge. Yes. And I were to ask you this question. Mr. Chan, what's the very least you want in terms of further discovery? What would you say? I would say what was denied to us at page 26 of the joint appendix. That is in November 2006. It's the point at which it's been described. We got lots of discovery except for a minor issue that American calls a minor issue. We don't know why it's a minor issue. That's exactly the discovery we wanted. It's the XT and ZZ codes allocations. We put in a test, affidavit by our testifying expert explaining why on its face we thought it was reasonable to look further into that and why we wanted to do it. What is your answer to Mr. Feinberg's point that you want to get into the whole 558 million or whatever it was? Well, that's a trial. Two answers. First is the nature of the claim. We can't avoid the nature of the claim is that American paid more than it owed. These are large amounts, but the Court of Federal Claims deals with large numbers all the time. It may be a large dollar type of discovery. Secondly, though, is that that's really trial administration. If we're asking for things that are unduly burdensome and pushing the point of relevance, the trial court is fully empowered to manage the scope of discovery. What happened here, though, is we got none. I mean, we got none into what we wanted. You're saying as a matter of law, you were entitled to more given the rules on damages. Yes, and I would emphasize again that the reason the trial court didn't give us this discovery is because the trial court thought that as American has been arguing, the case was all about the amounts paid in the office and whether those were good amounts or bad amounts, and if they were bad, American gets them back and not about whether over time American paid more than it owed. We are not seeking an offset. We've explained basically the Sarah Lee case from the Court of Federal Claims is directly on point as our position, but the point is when you are asking plaintiff to prove, American comes in and says, I paid more than we owed. We paid more than we owed. We say, okay, how much did you pay and how much did you owe? Let's look into it. When you're at that phase, you're asking to add up, toad up the damages, if you will, the quantum. You're not seeking an offset of anything. You're calculating the amount of the alleged overpaying for the alleged exaction. That's the stage at which we were in which we were stopped and discovered. Thank you, Mr. Chadwick and Mr. Feinberg. The case is taken under submission. All rise.